IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
**Greenbelt Division**

| | | |
|---|---|---|
| GARY W. DAY<br>9000 Burning Tree Road<br>Bethesda, Maryland 20817 | * | |
| | * | |
| Plaintiff, | * | |
| v. | * | Case No.: |
| SETH A. ROBBINS<br>2215 North Greenbriar Street<br>Arlington, Virginia 22205 | * | |
| | * | |
| SEEGER, P.C.,<br>QUAGLIANO & SEEGER, PC<br>and SEEGER FAUGHNAN<br>MENDICINO, P.C.<br>2620 P Street NW<br>Washington, DC 20007 | * | |
| | * | |
| | * | |
| SERVE ON:<br>Steve Seeger<br>2620 P Street NW<br>Washington, DC 20007 | * | |
| | * | |
| Defendants. | * | |

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, GARY W. DAY, by his undersigned counsel, sues the Defendants, SETH A. ROBBINS, SEEGER, P.C., QUAGLIANO & SEEGER, P.C. and SEEGER FAUGHNAN MENDICINO, P.C., and for averments states:

**Parties, Jurisdiction and Venue**

1.  Plaintiff GARY W. DAY ("Day") is an individual who resides in Montgomery County, Maryland.

2. Defendant SETH A. ROBBINS ("Robbins") is an attorney licensed to practice law in the State of Maryland, District of Columbia and Virginia and, upon information and belief, during the time relevant to the allegations in this complaint, regularly represented clients in the Circuit Court for Montgomery County, Maryland.

3. Defendants SEEGER, P.C., QUAGLIANO & SEEGER, P.C. and SEEGER FAUGHNAN MENDICINO, P.C. (collectively or individually "the Law Firm') are successor entity law firms first incorporated in the Commonwealth of Virginia and then in the District of Columbia with their principal place of business in the District of Columbia.

4. During all times relevant to the allegations in this complaint, Robbins was a partner and/or corporate officer of the Law Firm, which regularly represented clients in Montgomery County, Maryland.

5. Jurisdiction is proper in this Court, pursuant to 28 U.S.C. §1332 in that the matter in controversy exceeds the sum of $ 75,000, exclusive of interest and costs, and is between citizens of different states.

4. Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(b), in that a substantial part of the events or omissions giving rise to the claim occurred in the counties of Maryland located within this judicial district.

**Underlying Facts**

6. In the early fall 2011, Robbins, as Day's attorney, called Day and asked if he was interested in "making a couple of bucks." Robbins explained that his long-time friend and client, Andy Persaud ("Persaud"), was the principal owner of a very successful construction company, Persaud Companies, Inc. ("PCI").

7. Robbins told Day that Persaud had recently been through a divorce and that PCI's surety (Hudson Insurance Company ("Hudson")) was requiring that PCI add another indemnitor to its general indemnity agreement ("GIA"). Robbins told Day that Persaud was looking for a financially strong third party to simply execute the GIA in exchange for a percentage of the value of bonds issued by the surety.

8. Robbins told Day that both Andy Persaud and the Persaud Companies were extremely strong financially and that Hudson was requiring the additional indemnitor only because Persaud was cash poor at the moment due to Persuad's divorce.

9. Day expressed concern to Robbins that Day had a lack of knowledge regarding construction industry surety practices and bonds, and Robbins assured Day that this was a "no-brainer" investment for Day.

10. In response to Day's expressed concerns, Robbins told Day that PCI was a very successful company and had huge margins, that Robbins and the Law Firm knew PCI very well and had been representing PCI for over 10 years, and that PCI had never had a claim asserted against it.

11. Robbins also represented to Day that Robbins had personally reviewed PCI's balance sheet and financial statements and that they were very strong.

12. Robbins further represented to Day that Andy Persaud had plenty of equity in his home and that if anything went wrong, which Robbins asserted was highly unlikely, Day would be completely protected from loss by the assets of PCI and Persaud. Robbins reiterated to Day that it would be "easy money."

13. Day responded to Robbins that Day trusted Robbins and that Day would be interested in investing if Robbins thought it would be worthwhile.

3

14. Robbins replied that it was a worthwhile investment, and that Robbins would call Day in the next week or so to discuss the details.

15. Day asked Robbins what Robbins wanted from this deal in terms of money. Robbins responded that he was just happy getting the legal work for both sides and he needed nothing more.

16. Robbins called Day back several weeks later and the two discussed the deal in more depth. Robbins asserted that he would take care of drafting all the documents and would assure that Day was protected and would have nothing to worry about.

17. Robbins represented to Day that Day would have the chance to review all information regarding the projects and would be given the express right to approve or disapprove of his indemnity for each project before any bonds were issued.

18. As compensation for Day's involvement, Robbins represented to Day that Day would receive 1% of the face value of any bond issued by Hudson. Robbins asserted that this percentage commission was the standard in the industry.

19. Robbins also represented to Day that PCI and Hudson had agreed that if there were ever a default on any bond, Hudson would first look to PCI and Persaud before it looked to Day and that Hudson would never reach Day because Andy Persaud and PCI were so strong financially.

20. Robbins also told Day that there would be a funds control agreement in place that would provide an additional layer of protection to Day.

21. At no time did Robbins inform Day that Robbins' own company would be administering the funds control agreement and that Robbins also had a financial stake in the venture.

22. On October 24, 2011, Robbins sent Day (with a copy to Persaud) an email detailing the terms of the deal as follows:

> Gary
>
> As a follow-up to our conversations the last couple of weeks and my e-mail from Friday… attached (again) is the general indemnity agreement. In general, the terms of the deal are as follows:
>
> 1) Gary Day will execute the general indemnity agreement (GIA).
>
> 2) Persaud Companies has already executed a GIA. It is understood that both Andy Persaud and Persaud Companies indemnity agreements shall be first in line.
>
> 3) Andy Persaud will personally and thru Persaud Companies, Inc. agree to a full and complete indemnity to Gary Day for any and all claims, costs, damages etc. incurred by Gary Day related to the GIA.
>
> 4) Persaud will pay to Gary 1% of the value bond(s) issued by Hudson and secured by Gary's GIA.
>
> 5) At this juncture, it is estimated the total value of the bonds to be secured by Gary's GIA are 5.1 million.
>
> 6) Hudson Surety and Mike Schendel [Hudson's bonding agent] have both agreed to modify the GIA to include language that for all bonds issued under Gary's GIA, they will first send a communication to me and Gary re: notice of a forthcoming bond and Gary must affirmative approve the same before the bond can be issued.
>
> I will prepare the corresponding paperwork, however above are the salient terms that both parties agree. If so, please affirmatively acknowledge the same.

23. On October 28, 2011, Robbins called Day saying that the GIA "needs to be signed today – right now." Day responded that he was busy at an associate's office, and Robbins asked if he could have the bonding agent, Mike Schendel ("Schendel"), drive the document over to Day.

24. When Schendel arrived, Day called Robbins and told him he did not have the time to read it and asked Robbins whether it was it ok to sign. Robbins responded, "Just sign it. – I've read it already and reviewed it for you."

25. Relying on Robbins' counsel, Day signed the GIA without reading it.

26. As he did not read the GIA, Day did not know that there were no provisions in the GIA stating that the PCI and Persuad indemnities would be first in line or requiring that Day would be given the opportunity to affirmatively approve the issuance of any bond.

27. Thereafter, without Day's knowledge or approval, Hudson issued payment and performance bonds on eleven projects. Without talking to Day, Robbins approved the issuance of each of the bonds.

28. Day was thereafter paid a $17,500 commission – amounting to a commission on only a fraction of one bond on the 11 projects.

29. Day never approved or had knowledge of any bonds other than the 5 that were on the original bond letter that he signed in front of Mike Schendel.

30. In July 2012, Day was shocked to receive a letter from Richard Pledger ("Pledger"), an attorney representing Hudson, asserting that Persaud was in default and demanding that Day exonerate the surety and place it in funds.

31. Day immediately called Robbins, and Robbins told Day not to worry, that the contents of the letter were obviously wrong, and that Robbins would handle it. Robbins stated that there had been some litigation with one of PCI's subcontractors, that PCI would be settling that claim, that PCI and Persaud were still financially strong, and that Day would not have any exposure.

6

32. Day received no further communication from either Robbins or Pledger until January 2013, when Day learned that he had been sued by Hudson in the United States District Court for the Eastern District of Virginia ("the indemnity litigation") for 2.7 million dollars.

33. Day immediately called and texted Robbins, who advised Day that he should consider hiring other counsel.

34. During the course of the indemnity litigation, Day learned that PCI had been placed in default on many of its projects and was in financial ruin. Day also learned: that Persaud had been investigated for bank fraud and wire fraud (and to our knowledge is currently serving time on those charges); that Seth Robbins knew at the time Day executed the GIA (see below) that PCI was in financial trouble; that Robbins' company, Chesapeake Escrow Services, LLC ("Chesapeake"), had been the funds control agent and had made loans to PCI in excess of a million dollars and had made the first such loan to PCI prior to Robbins' recruiting Day to be an indemnitor; that Robbins knew that substantial project funds had not been deposited into the Chesapeake funds control account because PCI had previously entered into a line of credit with Georgetown Bank secured by its receivables and that PCI deposited millions of dollars of PCI bonded project funds into Georgetown Bank's accounts.

35. In the indemnity litigation, while Day's counsel asserted a variety of defenses, no factual support was found for any substantive defense. Day's counsel did assert that Hudson had not properly designated some proposed expert witness testimony, giving rise to a technical defense against Hudson's performance bond (but not payment bond) claims.

36. After the filing of Hudson's Motion for Summary Judgment and Day's Opposition, Day entered into settlement negotiations and settled Hudson's claim against Day (at that time in excess of 4 Million Dollars), for $1,700,000.00.

**Robbins' Deposition Testimony**

37. Robbins gave the following deposition testimony in the indemnity litigation:

- When confronted by his communications with Hudson's counsel wherein he acknowledged he was representing all the parties, Robbins admitted that he represented PCI, Persuad and Day individually with regard to the matter.

- Despite his utilization of conflicts of interest waivers in the funds control agreement that he drafted for Chesapeake's escrow agreement, Robbins asserted that he did not know whether such a waiver would be required in his joint representation of Day, PCI and Persaud.

- Robbins admitted that *before talking to Day* about the deal, Robbins knew that Persaud was involved in a very, very bitter divorce (involving substance abuse issues) **and that Persaud was "pulling money out of the company."** Robbins failed to disclose these facts to Day, and if Day had known about these troubling issues, he never would have executed the GIA.

- Robbins admitted that when he first spoke with Day regarding the deal, Day said "if it's something you that you recommend, Seth, I trust you." Robbins stated further (*id.* at 41):

    A.   Unfortunately you know, bad things happen,

    Q.   And you recommended it to him,

    A.   I did.

- When asked whether he discussed with Day what an indemnity agreement was all about, Robbins answered, "I'm sure. I don't recall, but I'm sure Gary knows what an indemnity agreement was about." What Robbins did not tell Day and what Day

8

did not know was that his potential liability would be for the face amount on two bonds for each project (a payment bond and a performance bond), in essence doubling the potential exposure that Day had been told to expect, but not being given the right to receive commissions for both the payment and performance bonds.

- Robbins, admittedly Day's counsel, stated that he did not recall any advice that he gave Day with respect to executing the GIA.

- Robbins testified that he did not recall being asked to prepare formal agreements to memorialize the deal; but Robbins admits that he did not prepare those agreements.

- The reason Hudson was requiring an additional indemnitor on the GIA (not disclosed to Day by Robbins) was that Hudson did not have up-to-date financial information from PCI. When asked whether he told this to Day, Robbins responded, "I could have. I don't recall specifically." What is clear is that Robbins represented to Day that Robbins had reviewed PCI's financial statements and balance sheet, and Robbins represented to Day that PCI was financially strong. Certainly any financial statements or balance sheets that Robbins might have reviewed would have outdated information which had already failed to satisfy Hudson.

- In February, 2012 (three months after the GIA was signed and prior to the issuance of several Hudson bonds), Robbins made a loan of $950,000 from Chesapeake to PCI. Robbins further testified that Chesapeake had made a *previous* loan to PCI in a similar amount. Questioned regarding Chesapeake's

recap of the PCI escrow account activity, Robbins testified in relevant part as follows (*id.* 198-99):

> Q. All right. Starting with the first entry, February 27, 2012, it looks like the amount of nine or $50,000 wired from you to Persaud's accounts; is that right?
>
> A. From the escrow company to Persaud's account.
>
> Q. From the escrow company, and I read in your deposition transcript that you had previously wired the same amount of money prior to the state to percent.
>
> A. Maybe.
>
> Q. What you mean maybe? You don't remember that?
>
> A. If it's in the testimony, it's in the testimony. I don't recall specifically saying that.
>
> Q. You had testified that you had previously wired the same amount.
>
> A. Okay.
>
> Q. You've got to remember that, Seth. You don't remember that?
>
> A. Whether I testified to that or not?
>
> Q. No, whether you wired $900,000.
>
> A. I wired money to him in the past, yes. Whether it was the exact amount, I don't recall, but yeah, it sounds about right.
>
> Q. Had you wired money to him prior to the time that Gary had signed the GIA?
>
> A. I don't recall.
>
> Q. Is it possible you did?
>
> A. Yes.

- Robbins clearly knew that PCI had substantial cash flow issues and misrepresented this information to his client Day; Robbins never informed Day of his other client PCI's true financial picture. Upon being asked in his about the accounting of transactions between PCI and Chesapeake, Robbins declined to answer, noting that on the advice of counsel, he was going to "take the Fifth Amendment." Robbins did admit that he personally put $347,084.87 into Chesapeake to fund PCI payments, and testified that "I felt personally responsible for this. Okay? Gary is a friend of mine."

## COUNT I – LEGAL MALPRACTICE

38. Paragraphs 1 through 37 of this Complaint are incorporated by reference and repeated as if set forth in their entirety.

39. Robbins and the Law Firm owed to Day, their client, a reasonable duty to exercise that degree of care and diligence in representing their client used by attorneys engaged in the practice of law, and to properly perform legal services on behalf of their client, Day.

40. Robbins and the Law Firm breached the duties that they owed to their client Day in violation of the standards reasonably to be expected of a reasonably competent practitioner in their profession, and by their acts and omissions as demonstrated by the facts recounted above negligently failed to render proper representation to Day.

41. Robbins and the Law Firm breached the duties that they owed to their client Day in violation of the standards reasonably to be expected of a reasonably competent practitioner in their profession by *inter alia*: 1) failing to disclose to Day substantial and material issues relating to Persaud, PCI and the deal; 2) improper advice to enter a deal where Robbins failed to perform due diligence and in fact was on notice of PCI's substantial negative financial issues; 3) failing to

counsel Day as to the actual risks and rewards for the transaction; 3) failing to incorporate reasonable terms of the deal to protect Day; 4) failing to inform Day of the conflicts of interest among Day, PCI and Persaud; and 5) Robbins' self-dealing with regard to the Chesapeake transactions.

42.  As a direct and proximate result of Robbins' and the Firms' breaches of duties and malpractice, Day has suffered substantial economic loss and emotional trauma.

WHEREFORE, Plaintiff, Gary W. Day, demands:

A.  Judgment against Defendants, SETH A. ROBBINS, SEEGER, P.C., QUAGLIANO & SEEGER, PC and SEEGER FAUGHNAN MENDICINO, P.C., in the amount of Two Million Dollars ($2,000,000.00), with interest, costs; and,

B.  For such other and further relief as this Court deems to be just.

_____
David Hilton Wise
James P. Lukes
WISE & DONAHUE, PLC
10476 Armstrong Street
Fairfax, Virginia 22030
Tel:  (703) 934-6377
Fax:  (703) 934-6379
dwise@wisedonahue.com
jlukes@wisedonahue.com
*Counsel for Plaintiff Gary W. Day*

_____
Brian S. Jablon
WELLENS & JABLON, LLC
540 B&A Boulevard, Suite 2
Severna Park, Maryland 21146
Tel:  (410) 647-1493
Fax:  (410) 647-1496

bjablon@wellenslaw.com
*Counsel for Plaintiff Gary W. Day*

### DEMAND FOR JURY TRIAL

Plaintiff, Gary W. Day, hereby requests that this matter be set for a trial by jury.

_____
Brian S. Jablon